# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WASHINGTON
# AT SEATTLE

| | |
|---|---|
| RICHARD BRADDOCK,<br><br>        Plaintiff,<br><br>  v.<br><br>ZAYCON FOODS, LLC; FRANK R. MARESCA, JANE DOE MARESCA, and the marital community composed thereof; MICHAEL GIUNTA, JANE DOE GIUNTA, and the marital community composed thereof; and MIKE CONRAD, JANE DOE CONRAD, and the marital community composed thereof,<br><br>        Defendants. | C16-1756 TSZ<br><br>ORDER |

THIS MATTER comes before the Court on the deferred portions of the motion for partial summary judgment brought by defendants Frank Maresca, Michael Giunta, and Mike Conrad (collectively, "Individual Defendants"), docket no. 119, and the motion for partial summary judgment brought by plaintiff Richard Braddock, docket no. 124. Having reviewed all papers filed in support of, and in opposition to, the cross-motions, including the supplemental briefs filed at the Court's direction, *see* Minute Order (docket no. 155), and having considered the oral arguments of counsel presented at the hearing conducted on July 31, 2019, the Court enters the following order.

ORDER - 1

In his Amended Complaint, docket no. 76, plaintiff asserted nine claims. In their motion for partial summary judgment, Individual Defendants moved to dismiss all nine of plaintiff's claims, but they did not seek summary judgment on their counterclaims. Plaintiff, however, in his motion for partial summary judgment, sought to dismiss Individual Defendants' first counterclaim for declaratory judgment. By Minute Order entered April 19, 2019, docket no. 155, the Court partially denied Individual Defendants' motion for partial summary judgment, ruling that the motion did not seek dismissal on the merits of plaintiff's first (federal securities fraud) and second (state securities fraud) claims, which had been realleged as part of plaintiff's Amended Complaint, and that genuine disputes of material fact precluded summary judgment as to plaintiff's third (common law fraud), fourth (negligent misrepresentation), and fifth (breach of fiduciary duty) claims. Plaintiff's seventh (aiding and abetting breach of fiduciary duty) claim, which was pleaded against only defendant Adam Kremin, was dismissed with prejudice pursuant to a stipulation of the parties after having reached a settlement. *See* Stip. & Order (docket no. 159). In its prior Minute Order, the Court deferred ruling on Individual Defendants' motion with respect to plaintiff's sixth (breach of contract), eighth (declaratory judgment), and ninth (injunctive relief) claims, as well as on plaintiff's motion concerning Individual Defendants' first counterclaim for declaratory judgment, and those matters are the subject of this Order.

**Background**

Plaintiff Richard Braddock was, for some period of time, a member, a co-manager, and the Chief Executive Officer ("CEO") of defendant Zaycon Foods, LLC ("Zaycon"), a

now defunct Washington limited liability company ("LLC") that provided food products directly from the farm to the consumer, bypassing "the normal maze of wholesalers, distributors and other intermediaries." Am. Compl. at ¶¶ 3, 37 (docket no. 76); Bradley Decl. at ¶¶ 3-5 & Exs. A & B (docket no. 132) (indicating that Zaycon ceased operations and dissolved in 2018). The crux of plaintiff's breach of contract claim is that he was improperly removed as Zaycon's co-manager and CEO. Plaintiff seeks a declaratory judgment that his termination was not effected by the requisite 80% of Zaycon's Class A units, see Am. Compl. at ¶ 331 (docket no. 76), and he seeks injunctive relief reinstating him as Zaycon's co-manager and CEO, see id. at ¶ 339. Contrary to plaintiff's argument, and for the reasons stated in this Order, the Court CONCLUDES as follows:

(1) Members holding at least 80% of Zaycon's Class A units consented to plaintiff's removal as co-manager, and plaintiff's replacement as co-manager by defendant Michael Giunta was accomplished in accordance with Zaycon's Operating Agreement;

(2) Giunta and the other co-manager, defendant Frank Maresca, provided plaintiff with requisite 30 days prior written notice and terminated plaintiff as Zaycon's CEO in the manner set forth in the Employment Agreement between plaintiff and Zaycon; and

(3) Plaintiff's claim that his discharge as co-manager and CEO of Zaycon constituted a breach of the Operating Agreement and/or Employment Agreement lacks merit.

A. **Removal of Manager**

The Operating Agreement for Zaycon, as amended prior to plaintiff's termination as co-manager, provided in relevant part:

> The Company shall be managed by two Managers. A Manager shall serve until his or her death, disability, resignation or removal by Members holding at least eighty percent (80%) of the Class A Units.

Operating Agreement at § 4.1, Ex. A to Tift Decl. (docket no. 125-1 at 28); <u>see also</u> Ex. O to Elsden Decl. (docket no. 120-1 at 127); Exs. 11 & 17 to Braddock Decl. (docket nos. 140-11 & 140-17). The parties do not disagree about how the language of § 4.1 should be interpreted or about the 80% threshold needed to discharge a manager. Instead, their dispute involves the provisions of the Operating Agreement relating to transfers of membership interests and the consequences of violating such provisions.

B. **Transfers**

The Operating Agreement outlines three ways in which membership interests may be transferred: (i) transfers approved by the manager and a majority of the members of the same class of membership; (ii) transfers qualifying as "Permitted Transfers" under Section 8.2 of the Operating Agreement; or (iii) transfers to new members pursuant to Section 2.2 of the Operating Agreement. <u>See</u> Operating Agreement § 8.1, Ex. A to Tift Decl. (docket no. 125-1 at 10-11); Ex. F to Elsden Decl. (docket no. 120-1 at 74-75). At issue in this matter are four (4) transfers, each of which occurred before plaintiff became one of Zaycon's co-managers, namely (i) from Zaycon Food Holdings, Transport and Acquisition Corporation ("Z Holdings") to Saverio Solimeo; (ii) from Z Holdings to Luigi and Giovanna Solimeo; (iii) from Frank Maresca to The Saratoga Trust; and

(iv) from Michael Giunta to The Michael John Trust.  Each transfer involved less than all of the Class A (voting eligible) units held by the transferor, and Z Holdings, Maresca, and Giunta remained members of Zaycon until after plaintiff was terminated.

The parties agree that none of these transfers fall within the first category of approved transfers because none of them were subject to a vote of the membership.  In addition, Individual Defendants concede that none of the transfers at issue qualify as "Permitted Transfers," which include (i) transfers between existing members of the same class, and (ii) transfers to a revocable trust of which the transferring member is a trustee or co-trustee.  _See_ _id._ at § 8.2 (docket no. 125-1 at 11).  Although two of the four transfers at issue were to a trust, in each instance, the transferee trust was not revocable and the transferring member was not a trustee.  _See_ Exs. 32 & 33 to Braddock Decl. (docket nos. 140-32 & 140-33) (regarding The Michael John Trust); Exs. 35 & 36 to Braddock Decl. (docket nos. 140-35 & 140-36) (regarding The Saratoga Trust).

Individual Defendants contend, however, that each of the transfers at issue was valid under § 2.2 of the Operating Agreement, which reads in relevant part:

> The Members expressly authorize the Manager to issue additional Units, and to admit future Members to the Company on such terms and conditions as the Manager deems appropriate, to include issuing Class A and Class B Units, subject to the other conditions set forth herein.

Operating Agreement at § 2.2 (docket no. 125-1 at 4).  According to Individual Defendants, defendant Mike Conrad, who was the sole manager of Zaycon at the time of the transfers in late 2014 and early 2015, had authority to admit new members without a

ORDER - 5

vote of the existing members, and his approval of the transfers at issue was sufficient. *See* Conrad Decl. at ¶¶ 7-10 (docket no. 122).

Plaintiff argues that Individual Defendants are misconstruing § 2.2 and that, because the transfers at issue violated the Operating Agreement, neither the transferors (all of whom retained some Class A units and remained Zaycon members after the transfers) nor the transferees had any right to vote the transferred units. Plaintiff relies on the following section of the Operating Agreement:

> Upon any Transfer of a Membership Interest in violation of this Article 8, the transferee shall have no right to vote or participate in the management of the business, property and affairs of the Company or to exercise any rights of a Member. Such transferee shall only be entitled to become an Assignee and thereafter shall only receive the share of one or more of the Company's Net Profits, Net Losses and distributions of the Company's assets to which the transferor of such Economic Interest (defined below) would otherwise be entitled.

Operating Agreement at § 8.4 (docket no. 125-1 at 11). Plaintiff takes the position that the voting rights associated with the Zaycon units purportedly transferred to Saverio Solimeo, Luigi and Giovanna Solimeo, The Saratoga Trust, and the Michael John Trust simply vanished, and in his motion for partial summary judgment, he asks the Court to rule, as a matter of law, that his "vanishing voting rights" theory has merit.

C.      **Tally of Votes**

Plaintiff was advised by letter dated April 21, 2016, that members holding at least 80% of Zaycon's Class A units had voted to remove him as co-manager, that Michael Giunta had been installed as his replacement, and that Giunta, along with the other co-manager, Frank Maresca, was providing him with notice of his termination as CEO,

1 pursuant to § 8.2 of his Employment Agreement.  *See* Ex. 30 to Braddock Decl. (docket
2 no. 140-30); *see also* Employment Agreement, Ex. 18 to Braddock Decl. (docket no. 140-
3 18).  Plaintiff has calculated the units attributable to allegedly improper transfers as
4 follows:

| Purported Transferee | Units Purportedly Transferred | Percentage of Class A[1] Units |
|---|---|---|
| The Michael John Trust | 8,500,000 | 32.3% |
| The Saratoga Trust | 1,967,666 | 7.48% |
| Luigi and Giovanna Solimeo | 665,106 | 2.53% |
| Saverio Solimeo[2] | 155,565 | 0.59% |
| TOTAL | 11,288,337 | 42.9% |

*See* Exs. 9, 12, & 34 to Braddock Decl. (docket nos. 140-9, 140-12, & 140-34).  Plaintiff contends that, if the percentages associated with the purported transferees' units are disregarded, then his removal did not receive the requisite 80% approval, and he should not have been discharged or replaced.  Plaintiff's math is incomplete, but the figures, when appropriately viewed, still support his point.[3]  On the other hand, if the transferors

---

[1] In computing the percentages associated with each purported transferee, plaintiff used as the denominator the total number of Zaycon units (29,052,339), including both Class A and Class B units.  *See* Ex. 34 to Braddock Decl. (docket no. 140-34).  Doing so was inconsistent with § 4.1 of the Operating Agreement, which contemplates that only members holding Class A units may participate in a decision to remove a manager.  The percentages in the above table are instead based on the total number of Class A units (26,310,581).

[2] After Saverio Solimeo ostensibly received 155,565 units from Z Holdings, he also acquired 103,093 units from Mike Conrad and 103,093 units from Adam Kremin, for a total of 361,751 units.  *See* Ex. 9 to Braddock Decl. (docket no. 140-9).  Plaintiff challenges Saverio Solimeo's voting rights with respect to only the units purportedly transferred by Z Holdings.  *See* Ex. 34 to Braddock Decl. (docket no. 140-34); *see also* Braddock Decl. at ¶ 80 (docket no. 140).

[3] Because plaintiff asserts that the Class A units transferred to the Solimeos by Z Holdings and to the two trusts could not have been voted by either the transferors or the transferees, the units also

ORDER - 7

(Z Holdings, Maresca, and Giunta) retained the governance rights associated with the units as to which the "Economic Interest" had been assigned, then their votes to remove plaintiff as co-manager resulted in an 85.4% consent rate, and Individual Defendants would be entitled to summary judgment.

**Discussion**

**A.     Summary Judgment Standard**

The Court shall grant summary judgment if no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a

---

may not be considered in tallying the total number of Class A units eligible to vote for purposes of determining, pursuant to plaintiff's argument, whether the 80% threshold was met. Plaintiff suggests that, of the 26,310,581 Class A units issued by Zaycon, 11,288,337 units had no voting rights, which leaves a total of 15,022,244 units that could, in plaintiff's view, participate in deciding whether to remove plaintiff as co-manager. The only members with Class A units who did not consent to plaintiff's discharge were Brandon Berezay (250,000 units), Jeremy Lewis (20,833 units), and plaintiff (3,579,410 units). _See_ Exs. 12 & 30 to Braddock Decl. (docket nos. 140-12 & 140-30). Under plaintiff's "vanishing voting rights" theory, the remaining members held only 74.36% of the Class A units eligible to vote.

| Member | Units | Percentage |
|---|---|---|
| Mike Conrad | 3,854,164 | 25.66% |
| Adam Kremin | 3,832,792 | 25.51% |
| Nathan Brown | 1,500,000 | 9.98% |
| Frank Maresca | 1,074,001 | 7.15% |
| Michael Giunta | 304,713 | 2.03% |
| Dean Conrad | 250,000 | 1.66% |
| Saverio Solimeo | 206,186 | 1.37% |
| Z Holdings | 150,145 | 1.00% |
| TOTAL | 11,172,001 | 74.36% |

_See_ Ex. 12 to Braddock Decl. (docket no. 140-12).

ORDER - 8

genuine dispute of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A fact is material if it might affect the outcome of the suit under the governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  To survive a motion for summary judgment, the adverse party must present "affirmative evidence," which "is to be believed" and from which all "justifiable inferences" are to be favorably drawn.  *Id.* at 255, 257.  When the record, however, taken as a whole, could not lead a rational trier of fact to find for the non-moving party on matters as to which such party will bear the burden of proof at trial, summary judgment is warranted.  *See Beard v. Banks*, 548 U.S. 521, 529 (2006); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *see also Celotex*, 477 U.S. at 322.

### B. <u>Manager's Authority to Approve Transfers</u>

In construing § 2.2 of the Operating Agreement to determine whether Conrad had the authority to approve the transfers at issue, the Court must apply Washington law.  *See* Operating Agreement at § 12.6 (docket no. 125-1 at 15); *see also Chan v. Soc'y Expeditions, Inc.*, 123 F.3d 1287, 1297 (9th Cir. 1997) (citing Restatement (Second) of Conflict of Laws § 187 (1988)).  Washington courts follow the "objective manifestation" theory of contracts.  *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 154 Wn.2d 493, 503, 115 P.3d 262 (2005).  Under this approach, the focus is on "the objective manifestations of the agreement, rather than on the unexpressed subjective intent of the parties." *Id.*  Words in a contract are assigned their reasonable, "ordinary, usual, and popular" meaning unless the agreement "clearly demonstrates a contrary intent." *Id.* at 504.  If the parties'

intent can be divined from the actual words within the four corners of the document, extrinsic evidence will not be considered. *See id.* at 503-04.

In this matter, the crucial component in § 2.2 of the Operating Agreement is the word "and," which appears between two clauses in the first sentence: "The Members expressly authorize the Manager to issue additional Units, ***and*** to admit future Members to the Company on such terms and conditions as the Manager deems appropriate . . . ." Operating Agreement at § 2.2 (docket no. 125-1 at 4). Individual Defendants contend that, in this context, "and" actually means "or," and their reading of § 2.2 would enable the manager to either issue more units or admit new members. Washington courts recognize that the conjunctive "and" and the disjunctive "or" may be substituted for each other when appropriate, *see Bullseye Distrib. LLC v. State Gambling Comm'n*, 127 Wn. App. 231, 239, 110 P.3d 1162 (2005); *Mount Spokane Skiing Corp. v. Spokane Cty.*, 86 Wn. App. 165, 174, 936 P.2d 1148 (1997), and Individual Defendants might have a colorable argument for substitution of the disjunctive in § 2.2, but for the language of § 4.2 of the Operating Agreement.

Section 4.2 defines a "Major Decision" as including "approving the Transfer of a Membership Interest to an Additional Member, and the admission of an Assignee as a Member except as otherwise provided herein," and indicates that a manager may not engage in a "Major Decision" until it has been approved by "a fifty-one percent (51%) majority vote of the Class A Members." Operating Agreement at § 4.2 (docket no. 125-1 at 6). Section 4.2 is consistent with § 8.1 of the Operating Agreement, which similarly requires a majority vote of members, in addition to the manager's approval, when the

transfer at issue is not a "Permitted Transfer" or the "admission of new members" pursuant to § 2.2. <u>See id.</u> at § 8.1 (docket no. 125-1 at 10-11). In light of the other provisions of the Operating Agreement, reflecting the members' desire not to make membership interests "generally available to persons or entities other than the present members," except as provided in the agreement, <u>see id.</u>, the Court concludes that, for purposes of § 2.2, "and" means "and," not "or," and Conrad's authority extended to the issuance of additional units to new members, not to unilateral approval of transfers from existing members to new members. As a result, the transfers at issue were in violation of the Operating Agreement.

**C.     Consequences of Improper Transfer**

Such conclusion does not, however, end the analysis. Although § 8.4 makes clear that, in the event of an invalid transfer, the purported transferee obtains no voting rights and becomes merely an "Assignee" who holds only an "Economic Interest," the provision does not explicitly indicate whether the purported transferor retains the voting rights associated with the units that were not effectively transferred. Thus, to understand the consequences to the transferor of assigning only an "Economic Interest," the Court must look to the statutes governing limited liability companies organized under Washington law. <u>See</u> Operating Agreement at § 1.1 ("Except as expressly provided in this Agreement to the contrary, the Members' rights and obligations . . . shall be governed by the [Washington Limited Liability Company] Act."); <u>see also Holman v. Brady</u>, 2016 WL 4921457 at *9 (Wash. Ct. App. Sep. 13, 2016) (indicating that both the current and former provisions of RCW Chapter 25.15 "contain a number of default

provisions on matters in the event an LLC agreement is silent" (citing RCW 25.15.018 & .801 (2016) and RCW 25.15.050 & .800 (1994) (repealed 2016)).

RCW 25.15.251, which took effect on January 1, 2016, after the Operating Agreement was last amended and after the purported transfers at issue occurred, but before plaintiff was removed as co-manager, provides:

> A transfer, in whole or in part, of a transferable interest . . . [d]oes not . . . entitle the transferee to participate in the management of the limited liability company's activities . . . .
>
> Upon transfer of less than the transferor's entire transferable interest in the limited liability company, the transferor retains the rights, duties, and obligations of the transferor immediately prior to the transfer other than the transferable interest transferred.

RCW 25.15.251(1)(b) & (3). A "transferable interest" consists of the "right to receive distributions of the limited liability company's assets." RCW 25.15.006(19). The statutory language is consistent with Zaycon's Operating Agreement, but uses different vocabulary to describe the concepts at issue. The statute denominates the right to receive distributions as a "transferable interest," while the Operating Agreement refers to such right as an "Economic Interest." _See_ Operating Agreement at art. 13 (docket no. 125-1 at 18). The statute calls an entity that has a right to receive distributions, but has not been admitted as a member, a "transferee," _see_ RCW 25.15.116(2)(b), while the Operating Agreement employs the term "Assignee," _see_ Operating Agreement at art. 13 (docket no. 125-1 at 17). Lexicography aside, the principle manifested by the statute and the Operating Agreement are the same, _i.e._, an LLC member may transfer a portion of the right to receive distributions without conferring on the recipient the right to vote or make

ORDER - 12

decisions on behalf of the LLC. In such circumstance, the statute fills in the gap left by the Operating Agreement's silence, and the transferor continues to have all of the rights of a member, other than the right to receive the assigned distributions, including the right to vote.

The same conclusion flows from the former LLC act, which was, on this subject, similar in substance to the current statute. From 1995 until 2015, the relevant provision indicated:

> (1) A limited liability company interest is assignable in whole or in part except as provided in a limited liability company agreement. The assignee of a member's limited liability company interest shall have no right to participate in the management of the business and affairs of a limited liability company except:
>
> (a) Upon the approval of all of the members of the limited liability company other than the member assigning his or her limited liability company interest; or
>
> (b) As provided in a limited liability company agreement.
>
> (2) Unless otherwise provided in a limited liability company agreement:
>
> (a) An assignment entitles the assignee to share in such profits and losses, to receive such distributions, and to receive such allocation of income, gain, loss, deduction, or credit or similar item to which the assignor was entitled, to the extent assigned; and
>
> (b) A member ceases to be a member and to have the power to exercise any rights or powers of a member upon assignment of **all** of his or her limited liability company interest.

RCW 25.15.250 (repealed 2016) (emphasis added). The Operating Agreement mirrors the former statute, using the term "Assignee" in materially the same way as the prior legislation, *see* Operating Agreement at art. 13 (docket no. 125-1 at 17) (an "owner of an Economic Interest who has not been admitted as a substitute Member"), and defining

ORDER - 13

"Economic Interest" in essentially the manner set forth in RCW 25.15.250(2)(a), <u>see id.</u> (docket no. 125-1 at 18).

Although the statutory terminology has now shifted from "assignment" to "transfer," and from "assignee" to "transferee," the legislative intent has remained constant. Restricting an LLC member's ability to transfer governance (<u>e.g.</u>, voting) rights helps ensure that the limited liability company is taxed like a partnership by avoiding one of the four characteristics of a corporation, namely "free transferability of interests." <u>See</u> Susan Kalinka, *Assignment of an Interest in a Limited Liability Company and the Assignment of Income*, 64 U. CIN. L. R. 443, 455-57 & 467-81 (1996). Allowing a member the freedom, however, to assign financial rights makes the LLC more attractive to investors. <u>See id.</u> at 480-81. These incentives for handling governance rights differently than financial rights have not changed over time, and thus, when the related law was recently rewritten, no reason existed for any substantive alteration to the doctrine that, as long as LLC members do not divest themselves of **all** of their interests, they continue to possess the rights associated with membership, except for the portion of any financial benefits they have assigned or transferred to another. To hold otherwise and adopt plaintiff's "vanishing voting rights" theory would run contrary to the explicit language of the current law, would undermine the financial advantages and investment strategies associated with assigning the right to receive distributions, and might unduly disturb the composition of an LLC.

D. **Plaintiff's Claims**

In light of the Court's ruling rejecting plaintiff's "vanishing voting rights" theory, Individual Defendants are entitled to summary judgment on plaintiff's breach of contract claim,[4] as well as on plaintiff's request for declaratory judgment that his termination as co-manager was in violation of Zaycon's Operating Agreement. Thus, plaintiff's Sixth Claim for breach of contract and Paragraphs 331, 335, and 336 of his Eighth Claim for declaratory judgment are DISMISSED with prejudice.[5] Because plaintiff's legal basis for seeking reinstatement as co-manager and CEO of Zaycon has been dismissed, plaintiff's prayer for such injunctive relief and his Ninth Claim are STRICKEN with prejudice. The Court notes that reinstatement would not have been an option, even if plaintiff had prevailed, because Zaycon is now defunct, and plaintiff's Ninth Claim is alternatively STRICKEN as moot.

---

[4] The Court is also persuaded that, regardless of whether plaintiff's removal as co-manager received the requisite 80% approval, plaintiff has not stated, with respect to his Employment Agreement, a breach of contract claim against Individual Defendants. Only plaintiff and Zaycon were parties to the Employment Agreement, see Ex. 18 to Braddock Decl. (docket no. 140-18), and the lack of privity constitutes an alternative basis pursuant to which Individual Defendants are entitled to summary judgment with respect to plaintiff's claim for breach of the Employment Agreement. See Collins v. Quintana, 2016 WL 337262 at *2 (W.D. Wash. Jan. 28, 2016).

[5] The parties are DIRECTED to address in their trial briefs (i) whether the following portions of plaintiff's Fifth Claim for breach of fiduciary duty should be stricken or dismissed as moot: Paragraphs 297, 298, 299, and 300 (docket no. 76); and (ii) whether any breach of fiduciary duty claim related to Individual Defendants' conduct as members (as opposed to managers) of Zaycon should be dismissed. See Dragt v. Dragt/DeTray, LLC, 139 Wn. App. 560, 574-75, 161 P.3d 473 (2007).

E. **Individual Defendants' First Counterclaim**

In their first counterclaim, Individual Defendants seek a declaratory judgment that, following plaintiff's discharge and Zaycon's exercise of its option to purchase all of plaintiff's membership interest, *see* Operating Agreement at art. 9 (docket no. 125-1 at 12-13), Zaycon was obligated to pay plaintiff the value of his interest in increments of only $150,000 per year. *See* Am. Answer & Counterclaims at 22-24 (docket no. 33). In his motion for partial summary judgment, plaintiff asked the Court to dismiss Individual Defendants' first counterclaim on the ground that he was improperly removed as co-manager and CEO of Zaycon. Plaintiff has not prevailed on the "vanishing voting rights" theory on which his request is premised, and thus, his motion for partial summary judgment is DENIED. Individual Defendants did not cross-move, and the first counterclaim remains at issue for trial.

**Conclusion**

For the foregoing reasons, the Court ORDERS:

(1) The deferred portions of Individual Defendants' motion for partial summary judgment, docket no. 119, are GRANTED;

(2) Plaintiff's Sixth Claim for breach of contract and Paragraphs 331, 335, and 336 of his Eighth Claim for declaratory judgment are DISMISSED with prejudice;

(3) Plaintiff's Ninth Claim for reinstatement is STRICKEN with prejudice and, alternatively, as moot;

(4) Plaintiff's motion for partial summary judgment, docket no. 124, is DENIED;

(5) The claims remaining for trial are as follows:

    (a) Plaintiff's first (federal securities fraud), second (state securities fraud), third (common law fraud), fourth (negligent misrepresentation), and fifth (breach of fiduciary duty) claims, with the caveat that the breach of fiduciary duty claim might be narrowed after the Court reviews the parties' trial briefs, *see supra* note 5; and

    (b) Individual Defendants' first (declaratory judgment) and second (breach of fiduciary duty) counterclaims, and defendants Maresca's and Conrad's third (tortious interference) counterclaim; *see* Giunta Am. Answer (docket no. 33); Maresca & Conrad Answer (docket no. 36).

IT IS SO ORDERED.

Dated this 21st day of August, 2019.

/s/ Thomas S. Zilly
Thomas S. Zilly
United States District Judge